IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

    vs.

                              Criminal No.
SETH ALLEN AIKENS, II,        2:22-cr-00119-WSH-1
            Defendant.

- - -

Transcript of Evidentiary Hearing on May 2, 2025 United States District Court, Pittsburgh, Pennsylvania, before Judge W. Scott Hardy.

APPEARANCES:

  For the Government:    U.S. Attorney's Office
                       Gregory Melucci, Esquire
                       U.S. Courthouse
                       700 Grant Street
                       Pittsburgh, Pennsylvania 15219

  For the Defendant:     Frank Walker Law
                       Frank Walker, Esquire
                       3000 N. Lewis Run Road, Suite 1800
                       Clairton, Pennsylvania 15025

  Court Reporter:        Aimee P. Martin, RMR, CRR
                       700 Grant Street
                       Suite 6260
                       Pittsburgh, Pennsylvania 15219

GOVERNMENT
EXHIBIT
3

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

1                                    INDEX

2       WITNESS:                                          PAGE:

3       <u>SETH ALLEN AIKENS, II</u>
        Direct Examination By Mr. Walker................   8
4       Cross-Examination By Mr. Melucci................  13
        Redirect Examination By Mr. Walker..............  26
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Friday, May 2, 2025
 2                   P-R-O-C-E-E-D-I-N-G-S
 3         THE COURT:  So this is the time and the place for an
 4   evidentiary hearing in the matter of United States of America
 5   versus Seth Allen Aikens, II Criminal No. 22-119.
 6         Counsel, if you would identify yourselves for the
 7   record, please.
 8         MR. MELUCCI:  Good morning, Gregory Melucci for the
 9   United States.
10         MR. WALKER:  Good morning, Your Honor, may it please
11   the Court, Frank Walker for Mr. Aikens.  Mr. Aikens is present
12   at Counsel table.
13         THE COURT:  Welcome and good morning to all of you.
14         So let me just lay out a little bit of background for
15   you all and for the record and then from my perspective what I
16   understand the issue to be.  That might help guide you all in
17   terms of how you direct your presentations to me.
18         So I'll note by background the Defendant is charged
19   in a 30-count indictment with the following:
20         Seventeen counts of wire fraud in violation of 18
21   United States Code Section 1343 for conduct occurring on
22   various dates between August 29, 2018, and March 21, 2020.
23   Those are Counts 1 through 17;
24         Seven counts of mail fraud in violation of 18 United
25   States Code Section 1341 for conduct occurring on various
```

1    dates between April 26, 2019, and August 15, 2019.  Those

2    relate to Counts 18 through 24;

3            And then six counts of money laundering in violation

4    of Title 18 U.S. Code Section 1957(a) for conduct occurring on

5    various dates between February 1st of 2019 to April 22nd of

6    2019, and those relate to Counts 25 through 30.

7            The Defendant's filed a number of pretrial motions.

8    I will just identify those.

9            First set of motions relate to motion for the

10   Government agents and local law enforcement officers to retain

11   rough notes and writings, motion for disclosure of promises of

12   leniency and/or existence of plea bargain agreements, motion

13   for early disclosure of *Jencks* materials, motion to produce

14   evidence that the Government intends to use under Federal

15   Rules of Evidence 404(b) and 609, motion for disclosure of all

16   prior testimony of unindicted coconspirators and/or

17   confidential informants, and for disclosure of the identity

18   and contact information for those folks, and then a motion for

19   discovery.  I note that the Court ruled on those particular

20   motions in an order on April 14th at Document No. 71.

21           There's also been a motion for a bill of particulars.

22   The Court ruled on that motion in a memorandum order also on

23   April 14th.  That appears at Document No. 72.

24           There's been a motion for a *Franks* hearing.  The

25   Court has not yet ruled on that motion, but that is not the

1    subject of today's hearing.  That motion appears at Document

2    No. 61.

3              And then finally, a motion to dismiss spoliation of

4    evidence appearing at Document No. 63, and that is the motion

5    that we are here to discuss today.

6              The Government's responded to the Defendant's

7    motions.  That omnibus response is at Document No. 67.  The

8    Defendant subsequently filed a reply to the Government's

9    response appearing at Document No. 70, and the Government

10   filed a surreply at Document No. 71.

11             With regard to the Defendant's motion for spoliation,

12   Defendant alleges that the Government executed a search

13   warrant to seize certain encrypted drives which contain his

14   personal files, projects, client projects, attorney-client

15   communications, and other personal and case-related data.

16             According to the Defendant, the drives contain

17   exculpatory materials critical to his defense, but due to the

18   Government's alleged -- I'm using quotes -- "forensic

19   failures" during the seizure process, the Defendant contends

20   that the materials were not properly preserved, and they have

21   been rendered permanently inaccessible.

22             The Defendant further contends that the loss of these

23   alleged exculpatory evidence raises spoliation concerns and

24   implicates his right to due process and a fair trial.  He

25   maintains that dismissal of the indictment is warranted.

1          In response, Government explains that the electronic

2    storage devices seized from the search of the Defendant's

3    premises include laptop computers, cell phones, computer

4    towers, and bulk sim or SD cards.  I'll refer to those as ESD.

5          The items were properly seized, stored, and

6    maintained in the possession of HSI forensic examiners for

7    later forensic review.  And those forensic examiners imaged

8    and copied certain of the ESD, installed it onto an external

9    hard drive, and delivered it to the Defendant.  With respect

10   to other seized ESD, forensic investigators encountered

11   encrypted data that couldn't be unencrypted despite their

12   sophisticated cracking tools.

13         The Government informed the Defense that certain

14   encrypted devices cannot be examined by forensic

15   investigators, but the devices could be examined by the

16   Defendant since he had the decryption key code.  If the

17   Defendant wished to examine any of the encrypted devices, he

18   would have to do so in a controlled environment at the HSI

19   office so the investigators can properly image the devices and

20   preserve the data.

21         By way of summary, the Government submits that it

22   made the ESD available to the Defendant and imaged as much ESD

23   as forensically available, but the Defendant did not accept

24   the invitation to examine the encrypted ESD.  The Government

25   attached to its response a letter from HSI computer forensics

1    Special Agent David J. Coleman refuting the Defendant's

2    contention that the encrypted data on the ESD is permanently

3    inaccessible as a result of the forensic examination.

4         Due to the disputed nature of the matter, the Court

5    scheduled today's hearing for the purpose of accepting

6    evidence.

7         All that being said, let me just say as a threshold

8    question and the thing I'm struggling to understand, you know,

9    is the first element of analyzing the motion here is evidence

10   has to be missing or destroyed, and it's not clear to me that,

11   based upon the moving papers, that it has been if he hasn't

12   even gone and met with the Government to use his passcode to

13   open it up.

14        "Is this hearing actually premature?" is sort of what

15   I'm wondering, and maybe it isn't.  Maybe that's a factual

16   dispute that we need to resolve today as well, but if it isn't

17   a dispute, then maybe tell me that.  And then we won't waste

18   time or resources today, and this is an issue for another day.

19   I'm not sure.  You can tell me.

20        MR. WALKER:  May I have a moment, Your Honor?

21        THE COURT:  Sure.

22    (Defendant consults with Counsel.)

23        MR. WALKER:  Thank you, Your Honor.  Your Honor,

24   after further review, we're prepared to proceed today and

25   offer any evidence this Court may deem necessary to rule on

1    the motion, Your Honor.

2              THE COURT:  Thank you.

3              MR. WALKER:  Defense calls Seth Aikens.

4              THE COURT:  Over here.  Ms. Woffington is going to

5    swear you in.  Then you can take a seat.

6              THE LAW CLERK:  Please raise your right hand.

7         (Administered oath.)

8              THE LAW CLERK:  Thank you.  Please have a seat.

9              SETH ALLEN AIKENS, II, a witness herein, having been

10   previously sworn, was examined and testified as follows:

                         DIRECT EXAMINATION

11

12   BY MR. WALKER:

13   Q.  Sir, can you state your name for the record?

14   A.  Seth Aikens.

15   Q.  Spell your last name.

16   A.  A-I-K-E-N-S.

17   Q.  You are the Defendant in this matter?

18   A.  Correct.

19   Q.  I'm going to limit my questioning to the issue before the

20   Court.  Did you hear the Court explain what the issues -- what

21   we're here for today?

22   A.  Yes, sir.

23   Q.  I want to draw your attention to the date in question when

24   the officers came to search and retrieve evidence from your

25   home.  You remember that date?

1   A.  The date, May 24th.

2   Q.  Did the officers come into your house and seize items from

3   a safe in your house?

4   A.  In the office, yes.

5   Q.  Can you explain what happened?

6   A.  What they did, I was already gone from there.

7   Q.  At some point in time, were you made aware that they came

8   into your house and retrieved some items which may be used in

9   this case?

10  A.  The search warrant return log.

11  Q.  You were made aware?

12  A.  Yes, sorry.

13  Q.  And at some point in time, did you review pictures of the

14  items for which the agents reportedly attempted to take items

15  from a safe in the office in your home?

16  A.  Correct.

17          MR. WALKER:  May I approach, Your Honor?

18          THE COURT:  You may.

19  BY MR. WALKER:

20  Q.  I'll show you what I have marked as Defense Exhibit A and

21  B which I have shown Government Counsel.  The Government will

22  stipulate that these were the items or pictures of the -- what

23  is that?

24  A.  This is my safe in my office here.

25  Q.  Those are pictures of the safe in your office?

1    A.  Yes, sir.

2          MR. WALKER:  Your Honor, I would move for their

3    admission.  I would note the Government has stipulated to the

4    authenticity and the foundation for their admission.

5          MR. MELUCCI:  I stipulate, Your Honor.  They're

6    photographs of the search.

7          THE COURT:  Admitted.

8          Is that Exhibit A?

9          MR. WALKER:  A and B.  They're two separate pictures.

10   BY MR. WALKER:

11   Q.  Let's look at Exhibit A.

12   A.  That's the before?

13   Q.  Yes.

14   A.  Yup.

15   Q.  Can you show me what is depicted in Defense Exhibit A?

16   A.  Well, there's book documents in the middle here, but most

17   notably there's two hard drives.  And then in this top folder

18   there's about 31 papers listing passwords and a USB drive.

19   Q.  And I want you to refer to Exhibit B.  What is Exhibit B?

20   A.  This was their after photo.  I can't remember the name of

21   the guy who took it, but this is what he -- what they had left

22   showing that that's gone, the binder, the plastic binder, and

23   then the two hard drives and then all of the book documents.

24   Q.  You kind of jumped ahead a little bit.

25   A.  Sorry.

1    Q.   What's the difference between A and B?

2    A.   That they have the papers listing passwords.  The USB, the

3    book documents and the hard drives are gone, the trail camera.

4    Q.   And when you say "they," who are you referring to?

5    A.   Agent Gealey and Agent Coma [sic].

6    Q.   And the devices that were taken that are differentiated

7    between A and B, do you know what was contained on those

8    devices?

9    A.   Yeah.  We submitted it to the Court.

10   Q.   And in what format?  What are you saying?

11   A.   When we listed what we didn't have versus what we had.

12   Q.   Now, you stated earlier that there was folders, a binder

13   of passwords.  You remember saying that?

14   A.   There's papers listing passwords in this top --

15   Q.   Why are the passwords relevant for today's hearing?

16   A.   Because that's the only way to access the drives because

17   they turned off the computer in the house.

18   Q.   So did you ever receive a copy of those papers back in any

19   discovery items?

20   A.   Nope.

21   Q.   Is it your contention that those passwords were linked or

22   able to open the devices that were in that locker?

23   A.   Absolutely.

24   Q.   Why do you make that contention?

25   A.   Because there's only one way to get into them, one way

1    out.  There's one key.

2    Q.  Are you familiar with a document called evidence recovery

3    log?

4    A.  Yep, the search warrant return.

5    Q.  Why -- how are you familiar with that?

6    A.  It had been disclosed later on that, "Hey, this is what

7    they took."

8    Q.  How is that relevant for your argument today?

9    A.  Because it states that they left the house with the papers

10   listing passwords, the book documents, and the drives.

11   Q.  If I showed you a copy of that log, would you recognize

12   it?

13   A.  Yeah.

14          MR. WALKER:  May I approach, Your Honor?

15          THE COURT:  You may.

16   BY MR. WALKER:

17   Q.  I'm going to show you what I will mark Defense Exhibit C.

18   What is that, sir?

19   A.  The search warrant return log.

20   Q.  Can you turn to the page and identify the page that talks

21   about the passwords that were taken from the safe in your

22   office?

23   A.  Yes, Page 2 of 4, ISO-0000634953, and it says "Book

24   storage media and papers listing passwords, Room 0, Special

25   Agent Coleman."

1   Q.  And who authored that document?

2   A.  I believe it was Martin Blow.

3   Q.  Can you review the document, see if that's accurate?

4   A.  At the top of Page 1 it says, "Preparer assistant and

5   Inspector Blow."

6         MR. WALKER:  Thank you, Your Honor.  I have no

7   further questions.  Offer for cross.

8         MR. MELUCCI:  Thank you, Your Honor.

9                CROSS-EXAMINATION

10  BY MR. MELUCCI:

11  Q.  Mr. Aikens, have you ever had a day in any formal forensic

12  training of digital devices?

13  A.  No.

14  Q.  Have you ever forensically examined a mobile device or a

15  computer device or a hard drive for data stored on that

16  device?

17  A.  Yeah.  I'm similar with Cellebrite.  I'm familiar with

18  AXIOM.  I'm familiar with MKey.

19  Q.  My question is "Have you ever conducted a forensic

20  examination of a device?"

21  A.  Like you can load and play -- you know, like utilize them.

22  Like I wasn't going out and completing them.

23  Q.  What is your background in digital media, digital

24  forensics?

25  A.  I wouldn't have a specific background in it.

1  Q.  Do you have any training in it?

2  A.  I wouldn't say training, but I've created products such as

3  the body cam app which, you know, contain the audit log,

4  contain encryption, and things related.

5  Q.  So you don't have any formal training in digital forensics

6  or digital media, schooling that is?

7  A.  I'm sorry?

8  Q.  S-C-H --

9  A.  Schooling, no, no.

10  Q.  So everything you know about apps, digital media, mobile

11  devices, other things you did, you claim you did for these

12  clients was all self-taught stuff?

13  A.  Correct.

14  Q.  What's your high school -- what was your high school

15  background?  Where did you go to high school?

16  A.  Horrible in high school, bad grades.

17  Q.  Did you go to college at all?

18  A.  No, sir.

19  Q.  Do you have any postsecondary formal training in anything?

20  A.  No, sir.

21  Q.  You filed an original motion alleging spoliation, right?

22  A.  Correct.

23  Q.  In that motion, you make accusations that the Government

24  has destroyed data during the attempted de-encryption of some

25  devices which were seized during the search?

1    A.  Correct.

2    Q.  What evidence do you have to back that up?

3    A.  The search warrant photos on the CDs.  The computers were

4    on in the house, all three of the computers.

5    Q.  But beyond that, what specific knowledge do you have to

6    present to Judge Hardy that you actually know that devices

7    that were seized by the Government during the search have been

8    damaged or ruined?

9    A.  Permanently inaccessible.

10   Q.  How do you know that?

11   A.  There's no other way to access the drives.

12   Q.  But you've never seen the drives.

13   A.  Well, in order to see the drives and get into the drive,

14   as we put in the motion, we need the exact key.  They're all

15   encrypted with AES-256.

16   Q.  Did you ever ask Mr. Walker, your attorney, to have the

17   Government provide the passwords that you contend are in a

18   binder?

19   A.  I would have thought they would have been returned in all

20   the other stuff we got.

21   Q.  That's not my question.  Did you ever ask Mr. Walker,

22   "Hey, Frank.  I think the passwords for those devices are in a

23   binder.  Tell Melucci to give them to me"?  Did you ever ask

24   him to do that?

25   A.  When I initially emailed him, I said that you guys have

16

1   the papers listing passwords and to notify you.

2   Q.  Do you have that email that you can show the Court that

3   suggests that a request was made to look at passwords that the

4   Government has?

5   A.  I couldn't remember the exact email to Frank, but we do

6   have that email.

7              MR. MELUCCI:  I can represent to the Court, Your

8   Honor, I've never received an email looking to provide

9   passwords.

10  A.  Sorry, not to you.

11  BY MR. MELUCCI:

12  Q.  The passwords you contend that are in these binders, would

13  they de-encrypt the items that are identified in Exhibit 6 on

14  the chart that was attached to the Government's omnibus

15  response?

16  A.  Would that be the -- is that the one that --

17             MR. MELUCCI:  Which I have marked as Exhibit 6, Your

18  Honor.  If I may approach.

19  Q.  So highlighted in orange, Mr. Aikens, are devices the

20  Government represents it cannot de-encrypt.  Do you have the

21  passwords for those?

22  A.  The passwords are only contained on the computer that was

23  turned in.  There's a logged-in password manager and then the

24  papers in the folder or in the binder.  And then there's a USB

25  drive in there that contains a plain text, like not encrypted

1    version, and those would decrypt it, yes.

2    Q.  So I'm a little confused.  You said the passwords were

3    contained in a binder that the agents seized during the

4    search, right?

5    A.  Correct.

6    Q.  Are those passwords the passwords that access those

7    encrypted devices?

8    A.  I would just note for the record that on the fifth item

9    down where it says, "The Government's unable to access all

10   these hard drives," and says that they are encrypted, these

11   are not actually all encrypted.

12       And then if you go down to the MacBook Pro -- there's two

13   MacBook Pros -- the second MacBook Pro, older 2011, is not

14   encrypted at all.

15   Q.  So your suggestion is that certain devices that we contend

16   were encrypted are not encrypted?

17   A.  These would be irrelevant to what we mean, these right

18   here.

19            THE COURT:  When you say "these," you need to

20   describe them.

21   BY MR. MELUCCI:

22   Q.  You need to be specific.

23   A.  USPIS items -- Line 0018 where it talks about all the

24   other hard drives and the miscellaneous comments, those aren't

25   the ones we're seeking entry to.

1    The ones that we would need are 0024, the two external

2    hard drives, and it says, "Where found, Room MC, Inspector

3    Gealey," and we would need the MacBook down at the bottom

4    specifically.

5    Q.  So you're saying on the MacBook.  On a MacBook seized by

6    the agents are the passwords to de-encrypt?

7    A.  No.

8    Q.  I'm not following.

9    A.  They contain project files.

10   Q.  We're not talking about project files.  The Court wants to

11   know, Seth, the passwords you contend will de-encrypt those

12   devices that the Government contends it cannot de-encrypt are

13   on the binder seized by the Government?

14   A.  Or if they have that USB drive, correct, or --

15   Q.  Which USB drive?

16   A.  The USB drive, it's a black NVS [phonetic].

17   Q.  Is it on that Exhibit 6?

18   A.  No.

19   Q.  No, it's not?  It's not?

20   A.  Well, they didn't list all of the USB drives.  Like in the

21   search warrant of photos, there's a book thing of -- it's in

22   the record.  It's with the computer on.  There's a thing of

23   USB drives, but they didn't take a picture of anything that's

24   in the safe.

25   Q.  Now, in November I met with Mr. Walker.  We talked about

1     discovery, and I invited him -- you through him -- to come to

2     the office, come to HSI, look at the encrypted devices.  You

3     could look at binders.

4          Did you ever tell Mr. Walker that you wanted to do that

5     because you wanted to see the contents of those binders and

6     could de-encrypt those devices?

7     A.  Well, the computer that's turned on in the search warrant

8     photos, the right one, the gaming computer, you guys had

9     turned that over in discovery.  So I --

10    Q.  I'm not asking that, Seth.  Just answer the question I ask

11    you.  Did you ever tell your attorney, Frank Walker, that you

12    wanted to come to HSI offices and look at the contents of the

13    devices seized by the agents during the search?

14    A.  I just told him that it was impossible.

15    Q.  Well, how do you know that?

16    A.  Because we don't have the papers listing the passwords.

17    No RAM dump was performed on the one in the house, and we --

18    Q.  But you're saying that the passwords are contained in the

19    binders.  You can easily access the passwords from the

20    binders, can't you, Seth?

21    A.  If they're there, we could.

22    Q.  Well, why wouldn't they be there?  Are they handwritten?

23    Are they typewritten?

24    A.  They're printed.

25    Q.  What color is the binder?

1    A.  Silverish and gray.

2    Q.  Did you ever tell Mr. Walker, "There's a silver binder

3    that contains the passwords to de-encrypt the hardware, the

4    devices"?

5    A.  Well, it's always been noted that it had the papers.

6    Q.  Where is it noted?

7    A.  In the search warrant log that they had the papers listing

8    passwords.  I didn't have any other passwords anywhere else

9    that were printed.  They're all in the safe as we said.

10   Q.  Why didn't you tell your attorney that you wanted to see

11   the binder to look at the passwords so that you could look at

12   this content which you believe contains useful information to

13   your case?

14   A.  My assumption was that based on the house -- the ones they

15   shut down, they proclaim they couldn't get into -- they had

16   gotten into the one on the right.  So if they had done that,

17   that's one of the papers listing passwords within that binder.

18   Q.  Did you see the letters from Special Agent Coleman and the

19   CSIPS Investigator Joseph Soeka?

20   A.  Yeah.

21   Q.  Do you agree with what they said?

22   A.  I would disagree.

23   Q.  Do you have more training than they do, Seth, in digital

24   forensics?

25   A.  No, but there's discrepancies with what they had said.

1   Q.  I see.  And the discrepancies being what?

2   A.  So if they have the iPhone imaged, there's not a lot of

3   case law around cracking an iPhone.  There's only a certain

4   amount of tools that can do it:  GrayKey, Cellebrite, Checkm8

5   exploit, things of that nature.

6       So if they're able to get what's called the raw image, the

7   DD image, the bin image, they could convert that to the EO1

8   format.  EO1 stands for expert formats buying case I believe

9   and then have turned that over versus providing whatever zip

10  file that came from.

11      My assumption is wherever that zip file came from is an

12  extraction from somewhere else just simply loaded into AXIOM.

13  Q.  So you're contending that some of the finest forensic

14  examiners in the nation can figure that out if you're saying

15  it's that easy?

16  A.  Meaning they could turn this over in an EO1 image?

17  Q.  Yes.

18  A.  For the iPhone, yeah.

19  Q.  Do you want to look at the encrypted devices?

20  A.  Unless you guys have the passwords, I don't -- we have an

21  expert.  There's just -- there's nothing we can do.

22  Q.  Who's your expert?

23  A.  Bit By Bit.

24  Q.  Who's Bit By Bit?

25  A.  I'm not sure of the gentleman's name.

1   Q.  My question is "Do you want to see the contents of those

2   encrypted devices, Seth?"

3   A.  We would lead them for specific things that we listed in

4   the record.

5   Q.  That's not my question.  My question is "Do you want to

6   see the contents of those encrypted devices?"

7   A.  Meaning do I want to have those?

8   Q.  I think it's a fairly straightforward question.

9   A.  Yes.

10   Q.  It sounds like from your motion you're alleging that the

11   devices have been ruined but contained evidence useful to you.

12   Do you want to see the contents of those devices?

13   A.  Yeah, in its unencrypted form.

14   Q.  But they're encrypted evidence that the Government

15   represents in its letters and its motions with the Court that

16   we cannot access.  Do you understand that?

17   A.  Yes, but the papers listing passwords were always in the

18   safe.

19   Q.  Why did you encrypt those devices?

20   A.  I always encrypt my stuff.

21   Q.  What's on there that needs to be protected?

22   A.  Nothing.  Why wouldn't someone want to practice their own

23   privacy?

24   Q.  Is there evidence that you believe is helpful to your case

25   on those devices?

1    A.  We submitted it in the record.

2    Q.  When we submit -- I don't understand that -- submitted in

3    the record.  What record?

4    A.  We put -- in the Court's record, there's two pages where

5    we state what files that were missing, and then I signed it at

6    the end.  And I sent it to Frank.

7    Q.  I'm not sure I've ever seen that.

8    A.  It's in the record.

9    Q.  Can you describe generally to the Court what's on the

10   contents of those encrypted devices that are in orange on

11   Exhibit 6 attached to the Government's omnibus?

12   A.  Can you repeat the question just one more time?

13   Q.  Can you tell Judge Hardy, generally if you recall, what's

14   contained in the contents of those encrypted devices?

15   A.  Every single one?

16   Q.  Yeah, if you can.

17   A.  I can't remember every single file that I have, but I know

18   that we submitted to the Court that Erin and Ryan's projects

19   are specifically on that MacBook.  Nonetheless, backups are

20   made --

21   Q.  Which MacBook is that?

22   A.  The 2011 MacBook.

23   Q.  Is that encrypted?

24   A.  It shouldn't be encrypted.  It's from 2011.  That's

25   premature for what's called "file vault," and that's Apple's

1    form of encryption.

2    Q.  Anything else?

3    A.  That's on there, yeah.

4    Q.  Anything else on the devices?

5    A.  Yeah, Scott Raybuck's website, original backup from Aaron

6    Cadena, all the files related to the Bluetooth lighting

7    system, all the files relating to Brute Cam's iOS app, Android

8    app, the original backup from Heartbeat Keepsakes, all the

9    order agreements from Avare Supply, the full text message

10   record from Ryan Beichner.

11   Q.  It would seem to me, if that was helpful to your case, you

12   would want to see it and show it to the Court?

13   A.  Understandably, yes, but it requires the encryption -- it

14   requires the encryption key.

15   Q.  Do you know what the encryption key is?

16   A.  No, sir.

17   Q.  Is it in the binder?

18   A.  There's papers listing passwords.  As we had noted, Agent

19   Coleman said that they're all BitLocker.  Okay.  The ones that

20   are in the safe in two external hard drives, those are not

21   BitLocker.

22       So when I represented to the Court what AES-256 was, there

23   should be eight specific -- and we had put that in our

24   motion -- encrypted drives in there.  So there should be eight

25   separate passwords for those specifically, and then there's

1    other passwords that I had, too.

2    Q.  But you would have to admit to Judge Hardy today that, as

3    of May 2, 2025, you have never asked to see the contents or

4    even attempt to look at the contents of those encrypted

5    devices?

6    A.  After Frank had met with you, he had sent me an email.

7    This is the first thing I got.  About a week later, he got me

8    a copy of the files.  He had to copy them to another drive.

9    He gave me them.  I reviewed them all.

10        And in January, I didn't specifically say, "File a

11    motion."  I had told him to immediately inform the U.S.

12    Attorney's Office that that's not the amount of data I had and

13    that something was wrong.

14    Q.  We're talking about encrypted -- the encrypted stuff?

15    A.  Correct, but that was only approximately the five

16    terabytes there.  We're missing that -- specifically the 18

17    terabytes is just the two external drives.

18    Q.  The answer it sound to me like is no.  You never asked to

19    see the contents of those encrypted devices?

20    A.  I wouldn't say that we haven't.  In the beginning, Mike

21    had explained he wanted to get a special master, but, I mean,

22    you know, he was doing his own thing.

23        MR. MELUCCI:  Your Honor, I don't know that I've got

24    anything further to ask Mr. Aikens.  Thank you.

25        THE COURT:  Thank you.

26

1          Any redirect?

2          MR. WALKER:  Yes.

3                         REDIRECT EXAMINATION

4    BY MR. WALKER:

5    Q.  Sir, is it your intent that, when you received the drive

6    in January from the Government, you observed -- you reviewed

7    the drive and noticed that there were files missing, and

8    that's when you noticed that the Government was not able to or

9    the Government was either not in receipt or did not review the

10   drives that were missing?

11         Is that your statement today?

12   A.  Correct, because when you open the AXIOM files, it

13   specifically says USB drive, USB drive.  That's not the two

14   drives from the safe.

15   Q.  Today, are you orally moving and requesting the Government

16   turn over the MacBook from 2011, the decryption files from the

17   silver notebook, and any and all files that they retrieved

18   from your house?

19   A.  Correct, with the addition of the iPhone X and the iPhone

20   8.

21         MR. WALKER:  Thank you.  No further questions.

22         THE COURT:  You may step down.

23         Mr. Walker, do you have any other witnesses?

24         MR. WALKER:  No, Your Honor.

25         THE COURT:  Mr. Walker, just housekeeping.

1           Did you move for admission of Exhibit C?

2           MR. WALKER:  That was an affidavit that an agent

3    wrote that wouldn't be able to be admitted, Your Honor.

4           THE COURT:  And then, Mr. Melucci, you made reference

5    to Exhibit 6 which I think is already in the record.  Okay.

6           MR. WALKER:  Your Honor, I do have the two exhibits,

7    A and B.

8           THE LAW CLERK:  Are these marked?  Can you mark these

9    A and B?

10           MR. WALKER:  I will.

11           THE LAW CLERK:  Thanks.

12           THE COURT:  Mr. Melucci, anything?

13           MR. MELUCCI:  No witnesses, Your Honor.

14           THE COURT:  With that all being said, here's what I'm

15   going to do.  I'm going to order the transcript of the hearing

16   to be prepared within 30 days, costs to be shared by the

17   parties.

18           I'm also going to issue a briefing schedule for the

19   submission of post-findings of fact and conclusions of law.

20   After briefing is completed, I'll take the matter under

21   advisement and go from there.

22           MR. WALKER:  Thank you, Your Honor.

23           THE COURT:  Any questions or issues you would like to

24   raise while we're all together?

25           MR. MELUCCI:  If I may, Your Honor, just briefly.

1          At the end, Mr. Walker asked that, you know, orally

2    motion to have the Government produce these certain devices.

3    The Government's represented in its filings, Your Honor,

4    repeatedly and in writing to Mr. Walker that all the Rule 16

5    discovery material that the Government recovered in its search

6    or in this case has been either provided or been made

7    available to the Defendant.

8          There is nothing further to produce.  I maintain as I

9    said in my motions and in the briefs, responsive briefs that

10   the only thing that's not been exposed are the contents of

11   these encrypted devices, and I think the Court sees in the

12   letters that were attached to my responsive motions that these

13   are simply not accessible and therefore not available to the

14   United States.

15         They're available to the Defendant, and I represent

16   that we never received a request to see the contents of those

17   items.  With respect -- and I appreciate what Mr. Walker is

18   asking for, but with respect to producing anything further,

19   there is nothing further to produce.

20         We still maintain and can make ourselves available at

21   HSI offices for the opportunity for Mr. Walker and his client

22   to come have the contents of these devices exposed through --

23   if he believes these passwords are contained in binders, look

24   at the binders, read the contents of those devices in the

25   presence of HSI forensic examiners.

1          THE COURT:  Understood.

2          Mr. Walker, is it your client's contention that he

3    didn't want to access those files in the presence of the

4    Government?  Is that what's holding this up?

5          MR. WALKER:  Your Honor, I don't believe that is his

6    contention.  I believe just the timeline of receiving the

7    information and knowing.  I think from Mr. Aikens' position --

8    and I'm sure he'll correct me if I'm wrong -- when he received

9    the initial discovery, there was nothing except a lot of paper

10   discovery from the prior attorney and then the prior

11   investigation.

12         Once I got on the case and received the drive after I

13   met with Mr. Melucci, then it was discovered there's some

14   information that is missing.  We need that information.  So I

15   think at that point, just the timing of it, he was just

16   requesting, "Hey, we need that information."  Hence, this is

17   why we had the motion.

18         I don't believe that it is -- I don't think it's

19   prudent to review any of the information in the presence of a

20   Government agent especially when you're the subject of an

21   investigation or the Defendant of an indictment.  So I would

22   request, whether it's by Mr. Aikens or on his behalf, that he

23   would not have to review that information in the presence of

24   any agent.

25         THE COURT:  Isn't he saying that the contents of

1    these things are exculpatory?

2            MR. WALKER:  Yes, yes, Your Honor.  To be fair, I

3    want to clear up the record if there is any confusion.

4    Mr. Melucci is correct.  He has made that available to us

5    from -- since he turned it over, Your Honor.

6            THE COURT:  I recognize and appreciate the arguments

7    you made thus far.  I'm certainly going to take those things

8    under advisement and do my analysis to make a decision.

9            Just stepping back 30,000 feet, just being pragmatic,

10   doesn't it make sense that you all get in the room and figure

11   out whether these files are accessible or not?  You're saying

12   you can't get into them.  You're saying, "I can't get into

13   them without these passwords that are contained in the silver

14   binder that they have."  The Government is inviting you to

15   come down and have that conversation.

16           Wouldn't that confirm or make sense?

17           MR. WALKER:  It would, Your Honor.  I don't know if

18   the Government has made clear -- forgive me.  I could be

19   wrong.  I don't think they have made it clear that they have

20   the actual binder that they turned over in the discovery to

21   let us know "Yes, we have the binder, and we have the

22   devices."  Then it would be, "Oh, okay.  Let's just go look at

23   it."  I don't think they have made clear that they have the

24   binder.

25           THE COURT:  From your perspective, if I'm

31

1    understanding the testimony correctly, you're saying the

2    Government seized the binder.  This binder contained

3    typewritten passwords.  All they had to do is type them in,

4    and they had access to the file.

5              Is that your position?

6              MR. WALKER:  I don't think it's that simple.  I think

7    it's a combination of a key code and the key codes that were

8    on -- in the binder, Your Honor.

9              THE COURT:  And is it your position that by not

10   having -- your client's saying this stuff is destroyed or

11   inaccessible.

12             Are you contending that that's a constitutional

13   violation?

14             MR. WALKER:  Yes, Your Honor.

15             THE COURT:  Fourth Amendment in particular?

16             MR. WALKER:  Yes, Your Honor, and also Fifth

17   Amendment by due process, Your Honor.

18             THE COURT:  I understand.  I will take the matter

19   under advisement after the transcript has been generated and

20   you all have an opportunity in your subsequent submissions.

21   I'm going to encourage you all in the mean time to keep

22   talking.

23             MR. WALKER:  Yes, Your Honor.

24             THE COURT:  I think maybe accepting the Government's

25   invitation to meet might actually kind of break through that

1    impasse, and if you ultimately choose not to do that, that is

2    your prerogative.  That may have consequences.  I don't know.

3    I would encourage that.

4            If you all think that bears fruit, certainly jointly

5    let chambers know, and maybe this motion becomes moot.  Maybe

6    this motion takes on a different shape after you have had that

7    conversation.  I don't know, but my sense is that it can't

8    hurt to try.

9            MR. WALKER:  Yes, Your Honor.

10           THE COURT:  Any other questions or concerns you want

11   to raise?

12           MR. MELUCCI:  Just follow-up with what Mr. Walker

13   said.  It's not possible to have Mr. Aikens look at the

14   contents of those encrypted devices without the presence of

15   HSI examiners because that is potentially incriminating

16   evidence for the United States' case in chief, and we have a

17   right to see that because they were lawfully obtained pursuant

18   to a search warrant back in May of 2022.

19           So the request to have him look at those devices

20   without the presence of HSI officers is not permissible.

21           THE COURT:  Mr. Walker, you want to respond to that?

22           MR. WALKER:  Your Honor, I understand the position.

23   I will maybe research the issue and present any supporting

24   case law on my position under separate cover.

25           THE COURT:  Before you say that, let me just say this

1    before anybody files any paper on that particular issue.  Why

2    don't you confer with one another.

3             MR. WALKER:  Yes, Your Honor.

4         (Defendant consults with Counsel.)

5             MR. WALKER:  Your Honor, after review and speaking

6    with Mr. Aikens, at the review of Defendant's Exhibit C, it

7    states what he's testified on the record, that -- I have the

8    number -- IS-0000634953 lists bulk storage media and papers

9    listing passwords that was recovered by detective or Special

10   Agent Coleman.

11            So it appears the Government has the binders.  It's

12   the question of whether or not they're able to use it to

13   access any exhibits or further access any exhibits.  I will

14   confer with Mr. Melucci to see if they have it, have they

15   tried it, and if so, what are the roadblocks there.

16            MR. MELUCCI:  We have never had a request to look at

17   any binders or passwords, but I've always -- and I represent

18   again that it's been my practice for 20 years with any

19   discovery that we have always made it available to the

20   Defendant, and in this case that offer has been extended

21   several times.  And we're happy to have him come to HSI and

22   look at these devices that we cannot see the contents of.

23            THE COURT:  This strikes me as being quite analogous

24   to the typical process of a child pornography quite frankly

25   when we have material on the computer, and the Defendant needs

34

1   to go to a place and view it.  Maybe there's differences here.

2   You can tell me if there are.  Okay.

3          Again, I'm going to ask for the transcript to be

4   produced.  You can do post-findings of fact and conclusions of

5   law.

6          Mr. Walker, I do need to say that I'm really

7   struggling, based upon the record before me, to get

8   comfortable with reaching a conclusion, based upon what you've

9   all presented, that you can affirmatively say that these

10  materials have been destroyed.  There's just no ability to

11  access them it sounds like.

12         Your client needs to do something to establish that.

13  I'm not saying he hasn't, but I'm struggling to get there.

14  You're going to have to persuade me, and maybe things need to

15  be done in order to do that.

16         MR. WALKER:  Yes, Your Honor.

17         THE COURT:  We're adjourned.  Thank you all.

18     (Whereupon, the proceedings were adjourned at 10:18 a.m.)

19                    C E R T I F I C A T E

20         I, AIMEE P. MARTIN, RMR, CRR, certify that the
    foregoing is a correct transcript from the record of
21  proceedings in the above-entitled case.

22

23  _\s\ Aimee P. Martin___          30th day of May, 2025
    Aimee P. Martin, RMR, CRR        Date of Certification
24  Official Court Reporter

25