**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 22-119 |
| | ) | |
| SETH ALLEN AIKENS, II | ) | |

**MEMORANDUM OPINION**

Defendant Seth Allen Aikens, II is charged in a thirty-count Indictment with the following: seventeen counts of wire fraud, in violation of 18 U.S.C. § 1343; seven counts of mail fraud, in violation of 18 U.S.C. § 1341; and six counts of engaging in a monetary transaction exceeding $10,000 from criminal proceeds, in violation of 18 U.S.C. § 1957(a). (Docket No. 3). Jury selection and trial are scheduled to commence on October 5, 2026. (Docket No. 118). Presently before the Court is the Government's Motion to Introduce Intrinsic Evidence of Fraud and Notice Pursuant to Fed. R. Evid. 404(b) (Docket No. 123), and Defendant's Response in Opposition thereto. (Docket No. 125). Also before the Court are Defendant's Motions *In Limine* to Exclude Evidence Pursuant to Fed. R. Evid. 404 (Docket Nos. 127 and 129), along with a Motion *In Limine* to Exclude Evidence Pursuant to Fed. R. Evid. 401 and a Motion *In Limine* to Exclude Evidence Pursuant to Fed. R. Evid. 403. (Docket Nos. 126, 128). The Government filed an Omnibus Response to Defendant's Motions *In Limine*. (Docket No. 132). Each of these motions relates to the same general constellation of evidence and will be addressed collectively herein.

## I. BACKGROUND

The Government alleges in the Indictment that, beginning in and around June 2016, and continuing thereafter until in and around March 2020, Defendant devised a scheme to defraud by making false representations to customers so that they would purchase his company's services, to

extract significant fees, to pressure them into making additional payments for non-existent services, and instead to use the customers' funds for his personal benefit.

Defendant allegedly began this scheme by trolling online for customers who had start-up businesses looking for someone to create computer or mobile applications, web page design and hosting, payment processing systems, etc. Defendant would sell his services based upon fabricated representations about his qualifications and experience, at times manufacturing false correspondence from businesses and showing realistic but counterfeit bank statements reflecting balances over $10 million, to convince customers to retain his services and falsely represent to customers that he would, if needed, provide financing for the projects from his own funds. Defendant prepared illusory agreements in the name of shell companies, making unfulfillable promises in exchange for large up-front flat fees, knowing that over time he would demand additional fees for "costs" and other expenses which never existed.

The Government further alleges that Defendant would continually demand more fees from his customers to "complete the project," having them pay far more than the agreed upon price. Sometimes he would propose "partnerships" with customers. Defendant refused to meet with them, instead having extensive cell phone "chats," creating excuses, and redirecting or lulling customers into believing paid for services were performed or that performance delays were being caused by unfounded excuses. Some frustrated customers confronted Defendant and demanded full refunds which never arrived, while others went to law enforcement authorities. Defendant laundered the fees he did receive from customers through multiple bank accounts and spent such funds on himself. The Government estimates that Defendant stole an aggregate amount of $1.3 million from approximately 8 customers.

The Government also contends that its investigators uncovered more victims beyond those

persons victimized by Defendant's charged offenses. The Government contends there are at least three others who were victimized by Defendant using the same pattern of fraudulent conduct. The Government seeks an *in limine* ruling that such evidence of prior unsuccessful business projects and uncharged "fraudulent" conduct is admissible. Defendant seeks an *in limine* ruling that such evidence is inadmissible. Separately, Defendant seeks *in limine* rulings that evidence of his luxury purchases and lifestyle should be inadmissible, and that the Government should be precluded from referring to him as a "scammer," "con artist," "schemer" and/or "swindler."

## II. DISCUSSION

### A. Other-Acts Evidence

The Government's Motion to Introduce Intrinsic Evidence of Fraud and Notice Pursuant to Fed. R. Evid. 404(b) (Docket No. 123) seeks an *in limine* ruling permitting it to present at trial evidence of uncharged acts of purported fraud related to Robert Polonsky, Brandon Canwright, and Hannah Hopper. Defendant's Motions to Exclude Evidence Pursuant to Fed. R. Evid. 404 (Docket Nos. 127, 129) seek, in part, to exclude such evidence from trial. For the reasons that follow, the Court will permit presentation of evidence pertaining to the uncharged acts of purported fraud and prior unsuccessful business projects related to Messrs. Polonsky and Canwright but will preclude presentation of such evidence related to Ms. Hopper. The Court will also permit presentation of evidence regarding Defendant's purchases and lifestyle.

Robert Polonsky is from Massachusetts and owned a company called "Swiss Cana Life." The Government proffers that Defendant promised to perform website development, website hosting, and advertising services for Mr. Polonsky and his company, but that Defendant lied to Mr. Polonsky about his capabilities to perform those services and never delivered the "core deliverables" Defendant had promised and for which Mr. Polonsky paid approximately $10,000.

In summary, the Government proffers the following testimony from Mr. Polonsky:

> Over time, his pattern became clear: he extracted money incrementally by manufacturing urgency, withholding deliverables, and continually moving the goalposts. He repeatedly promised written agreements, timelines, and clear next steps that never materialized. When questioned, he shifted explanations, deflected responsibility, or introduced new costs that were not part of the original understanding. He created dependency by taking exclusive control of the sites code, hosting, and workflow, then monetized that dependency by charging to resolve issues that stemmed from his own decisions or work.
>
> In the end, [Defendant] did not deceive me through a single dramatic event. He drained resources slowly and methodically, leveraging technical control, ambiguity, and your good faith. What he offered was not real partnership or service—it was a prolonged pattern of manipulation, misrepresentation, and financial extraction that left me with a broken website, no advertising deliverables, and financial loss. His conduct is not the result of incompetence alone; it aligns with a deliberate strategy to take as much as possible while giving as little as necessary to keep the engagement alive.

(Docket No. 123 at 3-4).

Brandon Canwright is from League City, Texas, and he owned a pressure washing company called "All-in-One Pressure Washing." The Government proffers that Defendant promised to develop for Mr. Canwright a website and related services for a one-time fee of $999.00. But soon after paying the initial fee, Defendant texted Mr. Canwright to induce him into paying for "lifetime" web hosting services at an increased cost by falsely claiming that his company did "press releases" for major news networks. In one such communication, the Government contends that Defendant texted Mr. Canwright the following:

> You could always upgrade to our lifetime package for $699 more ;) you'd have gotten unlimited video editing! We do full press releases from Fox News, nbc, abc news etc all included free with lifetime members! And any new business you start we build you the same value website …

(Docket No. 123 at 4-5). The Government also proffers that Mr. Canwright will testify he became

suspicious when the web page never materialized as promised so he questioned why promised services were not fulfilled and when Defendant refused to talk to him by phone, Mr. Canwright texted to Defendant the following message:

> If you'd like we can discuss it over phone. It's just a few things I want to make sure we are on same page about. There's been some things that you've said would be up and running by end of day on different days that haven't and still aren't. Dubia site is one. Roof wash discount on website, etc. Still haven't received referral payment and today is the 8th. I have several more people as well who I can refer. Just want to make sure everything is all good? I hired you because I know you do a great job and I need that. Great job and fast. Even bought the lifetime package with unlimited websites and SEO. The last company was a joke and stole my money. Don't want that happening again… don't feel like I'm left hanging…

(*Id*. at 5).

The Government further proffers that Defendant responded to this text message as follows:

> I understand the frustration if thats what you're heeding to. There is over 7,000 devices, when we build a website we optimize it for all, with the header. it is a simple task but apple alone has released many updates to the browser and so has android. We just needed to refine that process, then we had a new version of our builder and a new update to php 8.2.
>
> Developmental process. I feel none of this is detrimental in anyway, all is processing and moving along graciously for having no prior sitemap submitted. Again, you and I both have clients I don't mean to burden or attempt to excuse such; just providing a reality look from our POV.

(*Id.*).

The Government also proffers that Mr. Canwright will testify that Defendant promised to provide him with YouTube services, search engine services, and Google Facebook advertising campaigns, all of which he also never received. The Government proffers that Mr. Canwright paid Defendant approximately $1,877 for services never performed, and even filed a civil lawsuit to

recover these funds to no avail, prompting Mr. Canwright to send the following text message to Defendant:

> I would love to get this settled outside of court. That's all I ever wanted to begin with after you sent me the termination of services letter and offered a full refund but then refused to pay it. So now I've had to pay an additional $611 so far for legal fees and court cost. That now brings the total to $2498.00 and counting and who knows how much this has cost me overall since I've had no one to do my website and everything else we had agreed on that was never done. This does not include travel expenses to and from PA that will be included if I have to travel up there. I'm not doing anymore phone conversations though. We can discuss through text and I'm not gonna go back and forth."

(*Id.* at 6). The Government proffers that Mr. Canwright never received any refund from Defendant.

Finally, Hannah Hopper was Defendant's ex-girlfriend who lived with him for a time in 2017. The Government proffers that Ms. Hopper will testify that she wanted to purchase an iPhone and Defendant assured her that he could buy it less expensively through his company "Owl Apps." The Government further proffers that Ms. Hopper paid Defendant $700 - $800 for him to buy the phone but the phone never arrived, Defendant blamed the delay on "shipping from California," and when Ms. Hopper confronted Defendant he threatened her, ultimately causing Ms. Hopper to file a civil lawsuit in a magisterial court to recover her money.

The Government contends that evidence concerning Mr. Polonsky is both intrinsic to the charged fraud and is also admissible for permitted uses pursuant to Fed. R. Evid. 404(b). The Government also contends that evidence concerning Mr. Canwright and Ms. Hopper is admissible for permitted uses pursuant to Federal Rule of Evidence 404(b). Defendant counters that such evidence is not intrinsic to the charged offenses because such evidence pertains to separate and uncharged allegations arising from independent business dealings with Messrs. Polonsky and Canwright, and, in the case of Ms. Hopper, a personal transaction occurring during a dating

relationship. Defendant further contends that such testimony would be impermissible propensity evidence prohibited by Federal Rule of Evidence 404(b) and any probative value would be substantially outweighed by unfair prejudice and thus inadmissible pursuant to Federal Rule of Evidence 403.

Evidence of a criminal defendant's conduct which is not charged in the indictment, including crimes, wrongs or other acts, may be admissible if: (1) the evidence is intrinsic to the charged offense; or (2) the evidence is extrinsic to the charged offense but is offered for a permitted use under Rule 404(b). *See United States v. Green*, 617 F.3d 233, 249 (3d Cir. 2010). In the Third Circuit, evidence of uncharged acts is considered intrinsic if it "directly proves" the charged offense, or if it is "performed contemporaneously with the charged crime . . . [and] facilitate[s] the commission of the charged crime." *Id.* at 248, 249.

Uncharged acts which do not come within the definition of intrinsic evidence constitute extrinsic evidence and must meet the requirements of Rule 404(b) prior to being admitted at trial. Rule 404(b) bars "the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). Rule 404(b) provides, in relevant part:

> (b) Other Crimes, Wrongs, or Acts.
>
> (1) Prohibited Uses. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b).[1]

As articulated by the United States Court of Appeals for the Third Circuit, "Rule 404(b) is a rule of exclusion, meaning that it excludes evidence unless the proponent can demonstrate its admissibility, but it is also 'inclusive' in that it does not limit the non-propensity purposes for which evidence can be admitted." *United States v. Repak*, 852 F.3d 230, 241 (3d Cir. 2017). Given that "Rule 404(b) is a rule of general exclusion, the party seeking to admit other-acts evidence has the burden of demonstrating [the evidence's] applicability." *Id.* (internal quotation marks and citation omitted). Accordingly, "[a]dmissibility under Rule 404(b) requires the satisfaction of four distinct steps: (1) the other-acts evidence must be proffered for a non-propensity purpose; (2) that evidence must be relevant to the identified non-propensity purpose; (3) its probative value must not be substantially outweighed by its potential for causing unfair prejudice to the defendant; and (4) if requested, the other-acts evidence must be accompanied by a limiting instruction." *Id.* (citations omitted).

As to the first step of the Rule 404(b) analysis, a proper purpose is one that is "probative of a material issue other than character." *Huddleston*, 485 U.S. at 686. The Third Circuit Court of Appeals has held that "one proper purpose under Rule 404(b) is supplying helpful background information to the finder of fact." *Green*, 617 F.3d at 250. Accordingly, "allowing the jury to understand the circumstances surrounding the charged crime—completing the story—is a proper, non-propensity purpose under Rule 404(b)." *Id.* at 247 (citations omitted). Additionally, and relevant here, the Court of Appeals has held that motive is also a proper non-propensity purpose under Rule 404(b). *Id.* at 250. Likewise, the Third Circuit has observed that knowledge and intent

---

[1] Rule 404(b)(3) requires the Government to provide reasonable notice of any such evidence that it intends to offer at trial, along with the permitted purpose(s) and supporting reasoning, so that the Defendant has a fair opportunity to meet it.

are also proper non-propensity purposes. *Repak*, 852 F.3d at 242 ("The plain text of Rule 404(b) allows for the admission of other-acts evidence to show knowledge and intent"). Notably, in *Repak*, the defendant's knowledge and intent were elements of the two charged offenses, and he put his mental state at issue in the case by contesting those elements at trial. *Id*.

Next, the second step requires a showing that the other-acts evidence must be relevant to the identified non-propensity purpose. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. More specifically, for proffered evidence to be relevant to the identified non-propensity purpose, it "must fit into 'a chain of inferences—a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference.' " *Repak*, 852 F.3d at 243 (quoting *United States v. Davis*, 726 F.3d 434, 442 (3d Cir. 2013)). To that end, "a logical chain of inferences must be articulated so that we are 'assure[d] that the evidence is not susceptible to being used improperly by the jury.' " *Id.* (quoting *United States v. Caldwell*, 760 F.3d 267, 282 (3d Cir. 2014)). Put another way, the other-acts evidence must be linked to a non-propensity purpose with "careful precision," *id.* at 244 (quoting *Caldwell*, 760 F.3d at 281), such that the "chain of inferences [does] not require the jury to make 'too great a leap in logic.' " *Id.* at 245 (quoting *United States v. Brown*, 765 F.3d 278, 293 (3d Cir. 2014)).

The third step requires that other-acts evidence must not give rise to a danger of unfair prejudice that substantially outweighs the probative value of the evidence under Federal Rule of Evidence 403. *Repak*, 852 F.3d at 241, 246. Pursuant to Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Rule 403 "creates a presumption of admissibility." *Repak*, 852 F.3d at 246 (quoting *United States v. Claxton*, 766 F.3d 280, 302 (3d Cir. 2014)). "Evidence

cannot be excluded under Rule 403 merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect 'substantially outweigh[s]' its probative value." *Id.* (quoting *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002)). The Third Circuit instructs that a district court must "undertake some analysis," that is, "provide 'meaningful balancing,' when applying Rule 403 to determine the admissibility of Rule 404(b) evidence." *Id.* (quoting *Caldwell*, 760 F.3d at 283). A Rule 403 evaluation is not meaningful "if it merely states a bare conclusion." *Id.* at 247.

Finally, at step four of the Rule 404(b) analysis, the other-acts evidence must be accompanied by a limiting instruction if one is requested. *Repak*, 852 F.3d at 241, 248. Such an instruction must "advise[ ] the jury that the evidence is admissible for a limited purpose and may not be considered in another manner." *Id.* at 248 (quoting *Caldwell*, 760 F.3d at 277).

The Court now evaluates the Government's proffered other-acts evidence against these foregoing legal standards. In doing so, the Court also must be mindful of the elements of the charged offenses. The elements of mail fraud in violation of 18 U.S.C. § 1341 are the following: (1) that the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises; (2) that the defendant acted with the intent to defraud; and (3) that in advancing, furthering, or carrying out the scheme, the defendant used the mails or a private or commercial interstate carrier, or caused the mails or a private or commercial interstate carrier to be used. 3d Cir. Model Crim. Jury Instruction, § 6.18.1341. The elements of wire fraud in violation of 18 U.S.C. § 1343 are the following: (1) that the defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises; (2) that the defendant acted with the intent to defraud; and (3) that in advancing, furthering, or carrying out the scheme, the defendant

transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce. 3d Cir. Model Crim. Jury Instruction, § 6.18.1343. And, finally, the elements of money laundering in violation of 18 U.S.C. § 1957(a) include the following: (1) that the defendant knowingly engaged in, or attempted to engage in, a monetary transaction; (2) that the value of the funds or monetary instrument involved in the transaction or attempted transaction exceeded $10,000; (3) that the property involved in the transaction (that is, the funds or monetary instrument) was the proceeds of specified unlawful activity; (4) that the defendant knew that the funds or monetary instrument involved in the transaction or attempted transaction constituted criminally derived property; and (5) that the monetary transaction took place in the United States, or in the special maritime or territorial jurisdiction of the United States. 18 U.S.C. §§ 1957(a), 1957(d)(1), 1957(f)(2).

**1. <u>The Government's Proffered Other-Acts Evidence Involving Mr. Polonsky is Not Intrinsic to the Charged Offenses.</u>**

After careful review of the Government's proffered other-acts evidence involving Mr. Polonsky, the Court concludes that there is not enough detail set forth in the proffer to discern whether that evidence is intrinsic to the charged offenses. *Green*, 617 F.3d at 249. First, the Government fails to establish that Defendant's conduct vis-à-vis Mr. Polonsky was part and parcel of his allegedly fraudulent conduct in relation to those purportedly victimized customers identified in the Indictment. (Docket No. 3). Indeed, the Government does not allege a conspiracy nor is there anything proffered about the Defendant's business dealings with Mr. Polonsky that suggests those dealings facilitated or otherwise were interrelated with the charged offenses. Moreover, it is unclear, on the current record, whether the proffered other-acts evidence pertaining to Mr. Polonsky was performed contemporaneously with the charged offenses.

Even if the Government could supplement its motion with a more particularized proffer that Defendant's dealings with Mr. Polonsky occurred at or near the same times as Defendant's dealings with those alleged victims identified in the Indictment, it still would not be enough, absent more, because Defendant's dealings with Mr. Polonsky appear independent from his dealings with the customers identified in the Indictment so such dealings with Mr. Polonsky have no evidentiary connection to Defendant's alleged fraud scheme(s) pertaining to them. There simply is no basis to infer that Defendant's dealings with Mr. Polonsky facilitated his charged offense conduct in any way.

Therefore, the Court rejects the Government's argument that such other-acts evidence pertaining to Mr. Polonsky is intrinsic.

**2. <u>The Government's Other-Acts Evidence Regarding Messrs. Polonsky and Canwright is Admissible Pursuant to Rule 404(b).</u>**

The Government alternatively contends that its other-acts evidence involving Mr. Polonsky, as well as that of Mr. Canwright and Ms. Hopper, is nonetheless admissible extrinsic evidence proffered for proper purposes[2] unrelated to propensity of character pursuant to Rule 404(b). *See Repak*, 852 F.3d at 241. Defendant contends this evidence of uncharged fraudulent conduct, sometimes characterized as evidence of "prior unsuccessful business projects," is impermissible character evidence or evidence of propensity to act in accordance with a particular character trait inadmissible pursuant to Rule 404(b)(1). (Docket No. 129). Accordingly, such proffered testimony must be analyzed in accordance with Rule 404(b) and admitted into evidence at trial only if offered for permitted non-propensity purposes. *See Repak*, 852 F.3d at 243; *Caldwell*, 760 F.3d at 276-78; *Brown*, 765 F.3d at 294.

---

[2] The term "proper purpose" and "permitted use" are used interchangeably. *See* Fed. R. Evid. 404(b)(2) and *Caldwell*, 760 F.3d at 276.

In undertaking this analysis, the Court is mindful of the Third Circuit's often repeated and "emphatic" admonition that Rule 404(b) must be applied with careful precision, that the Government must explain how the proffered evidence fits into a chain of inferences that connects the evidence to a proper purpose devoid of any link comprised of a forbidden propensity inference, and that this Court must also articulate, with precision, the logical chain of inferences establishing that the evidence is probative of the permissible non-propensity purpose. *Repak*, 852 F.3d at 243; *Caldwell*, 760 F.3d at 276-78; *Brown*, 765 F.3d at 294. The Court must also evaluate whether such relevant other-acts evidence gives rise to a danger of unfair prejudice that substantially outweighs the probative value of the evidence under Federal Rule of Evidence 403. Finally, the Court notes that the proponent of the evidence, the Government here, bears the burden of both identifying a proper purpose and explaining how the proffered evidence is relevant to such purpose. *Caldwell*, 760 F.3d at 276. Controlling precedent is clear that the proffered evidence must be excluded if the proponent neglects or is unable to articulate this chain of inferences, and failure to exclude such evidence constitutes reversible error. *Id.* at 277.

The first question this Court must answer is whether the purpose(s) of the Government's proffered evidence is probative of a material issue other than character. *Huddleston*, 485 U.S. at 686. As described above, the Government seeks to proffer Defendant's dealings with Messrs. Polonsky and Canwright, and with Ms. Hopper, for the purposes of "revealing [his] intent to defraud, and the *modus operandi* of how he gained and manipulated unwitting customers." (Docket No. 123 at 7). Intent is a permitted use of such evidence as expressly stated in Rule 404(b)(2) ("evidence may be admissible for another purpose, *such as* proving . . . *intent* . . .) (emphasis added). Plan, preparation, opportunity, absence of mistake, and lack of accident, among other purposes, are also expressly identified in Rule 404(b)(2) and evidence proving any of these things

may demonstrate a defendant's *modus operandi* (*i.e.*, the mode of operating). Accordingly, intent and *modus operandi* are permissible evidentiary purposes.

Next, the Court is required to evaluate whether the identified non-propensity purposes provable by such other-acts evidence is relevant. Here, intent to defraud is a material element of both wire fraud and mail fraud, and it means to act knowingly and with the intention or the purpose to deceive or to cheat. Clearly, Defendant's intent is relevant. Likewise, these offenses require proof that Defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations, or promises. Such a scheme is any plan, device, or course of action to deprive another of money or property by means of false or fraudulent pretenses, etc., reasonably calculated to deceive persons of average prudence. Therefore, Defendant's plan or course of operation, *i.e.*, his *modus operandi*, is also relevant.

Evidence of Defendant's intent to defraud and his plan or course of action relating to his customers are probative of, and material to, the elements of the charged offenses. In this case, the Court and the parties anticipate that Defendant's intent will be a focal point of the trial. Defendant's course of dealing with prospects and customers, particularly his representations to them about his own experiences and capabilities, along with his representations to customers about the status of pending projects, is probative of Defendant's state of mind, including whether Defendant knew that his representations to them where true or false, whether he knew and intended the natural and probable consequences or results of his representations, and whether he nonetheless made those representations with the intent to defraud. This other-acts evidence makes it more likely that Defendant did not mistakenly overpromise on one or more business commitments but instead knew that his representations would not be fulfilled. Moreover, such evidence is probative of whether Defendants actions were part of a scheme, that is, a plan, device, or course of action,

reasonably calculated to deceive his customers. This inferential chain, such as it is, is devoid of any link that would require reliance on an impermissible inference purporting to show that Defendant had a propensity to act on a particular occasion in accordance with a particular character trait. Here, such evidence is "probative of a material issue other than character." *Huddleston*, 485 U.S. at 686; *Green*, 617 F.3d at 250; *see also Repak*, 852 F.3d at 245 (citing *United States v. Console*, 13 F.3d 641, 659 (3d Cir. 1993) (upholding the admission of other-acts evidence against two lawyers who conspired with a doctor to submit fraudulent medical bills to insurances companies showing that the lawyers also engaged in a similar scheme with doctors other than the doctor charged in the indictment, stating that this evidence "tended to support the finding that [the lawyers] knew [the] bills [related to the charged conduct] were fraudulent and that they intentionally submitted them to insurance companies as part of a broader plan to defraud insurance companies through fraudulent personal injury claims")).

The probative value of this evidence pertaining to Defendant's dealings with Mr. Polonsky or Mr. Canwright is significant because Defendant's state of mind and his purportedly fraudulent plan or course of dealings with customers are focal points of the trial. By contrast, any prejudice or confusion that may be engendered by evidence of these uncharged business dealings simply is not substantial enough to outweigh its significant probative value. Indeed, there is little risk that the jury would conflate or otherwise confuse Defendant's dealings with Mr. Polonsky or Mr. Canwright with his dealings pertaining to the several other customers who are the subjects of the charged offenses in this case. Moreover, any such prejudice would be further mitigated by a limiting instruction cautioning against drawing an impermissible propensity inference.

The Government's proffered testimony concerning Ms. Hopper, however, is meaningfully distinct from the proffered evidence pertaining to Messrs. Polonsky and Canwright. Any such

evidence pertaining to Ms. Hopper relates to a non-business transaction between Defendant and his then-romantic partner to assist her in saving money when purchasing a new iPhone. Unlike Messrs. Polonsky and Canwright, who were business customers just like the alleged victims of the charged offenses, Ms. Hopper was not a customer. Her relationship with Defendant was of a different nature. While such evidence may reveal that Defendant used similar deceitful tactics in his dealings with Ms. Hopper, his interactions with her did not occur during a business transaction but instead in a context where financial and other non-financial personal motivations may have been intertwined, so the probative value of this evidence is substantially less significant than the value of the evidence concerning Messrs. Polonsky and Canwright. Such evidence is likely to engender prejudice or confusion substantial enough to outweigh its probative value.

Accordingly, evidence pertaining to Defendant's business dealings with Robert Polonsky and Brandon Canwright may be presented at trial for permitted uses pursuant to Rule 404(b)(2) subject to an appropriate limiting instruction upon request. Evidence pertaining to Defendant's interactions with Hannah Hopper to help her obtain an iPhone is not admissible pursuant to Rule 404(b) based upon the record currently before the Court.

### 3. **The Government's Evidence of Defendant's "Luxury" Purchases and Lifestyle Is Admissible.**

Defendant's Motions to Exclude Evidence Pursuant to Fed. R. Evid. 404, (Docket Nos. 127, 129), Motion to Exclude Evidence Pursuant to Fed. R. Evid. 401, (Docket No. 128), and Motion to Exclude Evidence Pursuant to Fed. R. Evid. 403, (Docket No. 126), also seek an *in limine* order precluding the Government from presenting evidence at trial regarding Defendant's luxury purchases and lifestyle.[3] Defendant contends that such evidence is both irrelevant and

---

[3] Defendant also seeks to preclude evidence of uncharged "fraudulent" conduct, prior unsuccessful business projects, and evidence of forfeiture of items. (*See* Docket No. 129, ¶ 12). Although Defendant does not specify what

impermissible character evidence extrinsic to the charged offenses and that the probative value of such evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, etc. The Court disagrees.

As a threshold matter, the Government contends that these Motions are deficient because they do not specify what proposed evidence identified in the Joint Exhibit List Defendant challenges here. For instance, Defendant does not identify the evidence of his "lifestyle" or the specific "luxury items" purchased that he seeks to exclude. This Court agrees, for it cannot discern the inadmissibility of evidence that is not identified with specificity. Even so, the Court notes that such evidence, categorically, is intrinsically relevant to the charged offenses. As stated above, wire fraud and mail fraud each require proof of Defendant's intent to defraud, which necessitates that the jury consider Defendant's state of mind and permits the jury to consider, among other things, whether Defendant acted with a desire or purpose "to bring about some gain or benefit to himself." As alleged in the Indictment, "[i]t was the object of [Defendant's] scheme and artifice to defraud . . . to make false representations to clients so that they would purchase his . . . services, to extract significant fees, to pressure the clients into making additional payments for non-existent services, and to instead use the clients' funds for his personal benefit, including through the purchase of construction equipment, cars, trucks, and other personal items." (Docket No. 3, ¶ 4). Such evidence "directly proves" the charged offenses. *Green*, 617 F.3d at 248-249. Indeed, evidence of a defendant's wealth, profits, and spending habits are admissible to prove the motive or intent to defraud, which is relevant to Counts One through Twenty-four of the Indictment alleging wire

---

evidence relates to uncharged fraudulent conduct or prior unsuccessful business projects, the Court presumes that such evidence relates to Messrs. Polonsky and Canwright and Ms. Hopper addressed above. As for forfeiture items, the Government notes that forfeiture claims are not presented to the jury until after the jury returns a finding of guilt, and that it does not intend to offer evidence of forfeiture before then. (Docket No. 132 at 2). Consequently, this aspect of Defendant's Motion is moot, so the Court need not address it now.

fraud and mail fraud. *See Joyce v. United States*, 373 F. App'x 172, 180 (3d Cir. 2010) (holding that evidence of defendant's expenditures were relevant to insurance fraud charges because such evidence was probative of his motive and intent to defraud "in order to fund a more extravagant lifestyle"). Additionally, evidence that Defendant purchased several specified items, including a Mercedes Benz, with proceeds he allegedly gained from the acts of wire fraud and mail fraud, is directly relevant to the money laundering charges. Therefore, this evidence may also directly prove the money laundering charges alleged in Counts Twenty-five through Thirty of the Indictment. Accordingly, evidence such as that contained in Government Exhibits G-1800, G-1801, and G-1802 are directly relevant to the charged offenses.

The probative value of this evidence is significant because, as noted above, Defendant's state of mind, his purportedly fraudulent plan or course of dealings with customers, and his monetary transactions from criminally derived property, are focal points of the trial. Defendant's use of proceeds garnered from his business dealings is particularly probative here where he is alleged to have induced customers to pay additional sums to complete previously agreed upon or newly identified imperative tasks while contemporaneously making these expensive personal purchases. Defendant does not specify what prejudice this evidence might engender. However, to the extent Defendant would contend that the jury may be prejudiced against wealthy people or those who spend large sums of money on luxurious or otherwise unnecessary items, such concerns are attenuated and not substantial enough to outweigh the significant probative value of this evidence. *See United States v. Lattanzio*, 786 F. App'x 367, 368 (3d Cir. 2019) (affirming district court's decision that evidence of spending had significant probative value that outweighed the minimal potential for any unfair prejudice).

**B. <u>The Government Shall Be Precluded from Referring to Defendant Pejoratively to Connote a Fraudulent Character.</u>**

Defendant seeks an *in limine* order precluding the Government from referring to him as a "scammer," "con artist," "schemer" and/or "swindler." (Docket Nos. 126, 127). Defendant contends that the usage of such terms would impermissibly be used to insinuate a fraudulent character or a propensity to engage in conduct that accords with such a character trait. Such character evidence and argument are oftentimes impermissible. *See* Fed. R. Evid. 404. The Court generally agrees.

Characterizations of a criminal defendant as a "scammer" or "con artist" or other like-type monikers must be supported by admissible evidence. Even so, such language may be prejudicial and thus inappropriate. The Court also notes that usage of such language is highly contextual and what may be inappropriate early in a trial before an evidentiary record has been developed may be better supported by the evidence by the end of trial. Here, too, the Court draws a distinction between using nouns or adjectives to make *ad hominum* character attacks versus using verbs and adverbs to describe conduct. The Court cautions counsel against the former during opening statements and when questioning witnesses. Otherwise, the Court declines to make an *in limine* ruling and instead will defer such rulings until if or when presented at trial.

## III. <u>CONCLUSION</u>

The parties' respective Motions *in Limine* are granted in part and denied in part as specifically set forth herein.

An appropriate Order follows.

*<u>s/ W. Scott Hardy</u>*
W. Scott Hardy
United States District Judge

Date: September 23, 2026
cc/ecf: All counsel of record